1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

12

13

14

15

16

17

18

| | |
|---|---|
| HAMISH ANGUS,<br><br>            Plaintiff,<br><br>     vs.<br><br>TRANSNATIONAL AUTOMOTIVE<br>GROUP, INC., a Nevada corporation;<br>HOLLADAY STOCK TRANSFER,<br>INC., a Nevada corporation; and<br>STEPHEN WILSHINSKY,<br><br>         Defendants. | ) CASE NO. CV 09-00143 MMM (FFMx)<br>)<br>)<br>)<br>) FINDINGS OF FACT AND<br>) CONCLUSIONS LAW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

19

20

21

22

23

     Hamish Angus filed this action on January 8, 2009, naming Transnational Automotive

Group, Inc. ("TAG"), Holladay Stock Transfer, Inc. ("Holladay"), and Stephen Wilshinsky as

defendants.[1]  On June 15, 2009, the court denied defendants' motion to dismiss the amended

complaint for nonjoinder of a necessary and indispensable party and failure to state a claim on

24

25

26

27

28

---

[1]Complaint, Docket No. 1 (Jan. 8, 2009).  An amended complaint was filed on January 27, 2009. (First Amended Complaint for Conversion, Tortious Interference with Contract or Business Expectancy, Wrongful Transfer of Securities, and Negligence; Demand for Jury Trial ("First Amended Complaint"), Docket No. 4 (Jan. 27, 2009)).  Plaintiff previously attempted to sue defendants in the Western District of Washington (CV 08-00846 JLR); that action was dismissed for lack of personal jurisdiction on November 3, 2008.

1  which relief could be granted.[2]  On September 20, 2010, the court denied Wilshinsky's  motion
2  for partial summary judgment.[3]

3       The case was tried to the court on January 4 through 7, 2011.  Thereafter, the parties
4  submitted written trial briefs.[4]  Having considered the evidence presented, the arguments of
5  counsel, and the parties' trial briefs, the court makes the following findings of fact and conclusions
6  of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

8  **I.  FINDINGS OF FACT**

9  **A.  TAG's Founding and the Agreement with Angus**

10  1.  Plaintiff Angus is a corporate development consultant who resides in Vancouver, British
11      Columbia.  Defendant Wilshinsky is a California citizen who is a licensed securities
12      broker.  Defendant TAG is a Nevada corporation.  Defendant Holladay is stock transfer
13      agency incorporated in Nevada.[5]

14  2.  In the fall of 2005, Parker Automotive Group ("PAG") agreed to purchase Apache Motor
15      Corp. ("Apache"), a shell corporation that had no active line of business and was trading
16      on the over-the-counter bulletin board.  PAG had a business plan to operate an intercity bus
17      service in the Republic of Cameroon, but was in need of capital.  PAG acquired Apache
18      on December 30, 2005, so that PAG could raise capital as a publicly traded entity.  The
19      transaction was what is known as a "reverse merger."[6]  Following the reverse merger,

---

[2]Order Denying Motion to Dismiss Case, Docket No. 23 (June 15, 2009).

[3]Order Denying Defendant's Motion for Summary Judgment ("MSJ Order"), Docket No. 122 (Sept. 20, 2010).

[4]Pl.'s Trial Brief, Docket No. 158 (Jan. 26, 2011); Defs' Trial Brief, Docket No. 159 (Jan. 27, 2011).

[5]Amended Final Pretrial Conference Order ("PCO"), Docket No. 146 (Dec. 21, 2010), ¶ 5 (Admitted Facts for Which the Court Requires No Additional Proof).

[6]*Id.*

1    PAG changed its corporate name to TAG.[7]

2    3.    The Agreement and Plan of Exchange filed with the Securities and Exchange Commission

3          ("SEC"), provided for a share issuance and exchange of 240 shares of Apache for every

4          1 share of PAG, or a total of approximately 24 million shares.  The owners of Apache

5          were to receive cash in exchange for their shares.  The agreement contemplated that those

6          shares would not be retired but returned to treasury for reissuance to new TAG investors.[8]

7    4.    As of January 24, 2006, TAG's initial officers were Joseph Parker (CEO), Dan Goldman

8          (CFO) and Christine Cerisse (Corporate Secretary).  Parker, Goldman, William T.

9          Jacobsen, Ralph J. Thomson and Adam Jenn were TAG's directors.  Christine Cerisse

10         negotiated the reverse merger with PAG on Apache's behalf.[9]

11   5.    During the fourth quarter of 2005, before the reverse merger, Goldman engaged Angus

12         to provide certain corporate development services for PAG.  Angus' responsibilities

13         included assisting PAG in attracting start-up capital investors, recruiting and hiring

14         employees and developing the company's brand.  Parker approved of Angus' engagement.

15         Angus' agreement with Goldman called for existing shareholders of Apache ("the Apache

16         Group") to transfer 3 million free trading shares to Angus.[10]

17

18   _____

     [7]*Id.*

19

20   [8]*Id.*  See also RT Day 1 (Parker) at 22:24-23:13 ("This is a letter of intent between Parker
     Automotive Group and Apache Motor Corporation for a stock swap and acquisition of Parker

21   Automotive Group. . . .  Parker Automotive Group and Apache would merge through a stock
     swap of 240 shares of Apache for each share of Parker Automotive Group, and they would absorb

22   100 percent of Parker Automotive Group, and Parker Automotive Group would thereby take
     40-some-odd percent, 43, I think, around, percent of Apache, and my officers would assume

23   control of Apache Automotive Group"); Exh. 1 (Letter of Intent).

24   [9]PCO, ¶ 5.

25

26   [10]*Id.*  See also RT Day 1 (Parker) at 25:17-24 ("He was hired to find us – to help us find
     qualified investors, and these investors would invest in our corporation based on private placement

27   memorandums that we had filed with the SEC.  And in return, we would pay him or we would
     compensate him with stock in the corporation, and we would also pay expenses.  We offered to

28   pay a monthly stipend as well of about $5,000").

6.   Because the 3 million shares Angus was to receive had already been issued to the Apache Group, TAG needed to buy the shares from the Apache Group in order to transfer them to Angus.  The Apache Group agreed to sell the shares to TAG upon the payment to them collectively of $400,000.[11]  Cerisse understood that once the Apache Group received $400,000, the shares would be released to Goldman for distribution to Angus.[12]

7.   On December 30, 2005, the same day as the reverse merger, stock certificate 842 was issued to Angus for 350,000 free trading TAG shares.[13]  These 350,000 shares were transferred from an original Apache shareholder into "Angus' name to be held [in escrow] pending th[e] closing of th[e] agreement [for pyament of $400,000] at a future date."[14]

**B.   TAG Seeks Investment From the Wilshinsky Group**

8.   In January 2006, TAG prepared a private placement memorandum to sell up to 10 million shares of TAG common stock for $.50 per share. These shares were to be sold as restricted, non-publicly traded securities subject to sale pursuant to SEC Rule 144.  In February, TAG reduced the price to $.48 per share.[15]

9.   Angus contacted Jevon King of Qualico Capital in Vancouver, British Columbia about the opportunity to invest in TAG.  King, in turn, contacted Wilshinsky, and put Wilshinsky

---

[11]RT Day 1 at 82:24-84:6, Notice of Lodging of Deposition Transcripts, Docket No. 152 (January 3, 2011), Video Deposition of Christine Cerisse ("Cerisse Depo.") at 12:10-13:17.

[12]*Id.*

[13]PCO, ¶ 5.

[14]Cerisse Depo. at 14:5-24.  See also RT Day 2 (Angus) at 143:6-16 ("Q. From the time that you received those shares – well, let me go back to December 30th, 2005.  The record shows that 350,000 shares of stock – once again, there was a stock certificate prepared in your name.  Did you ever get a physical – did you ever get that stock certificate?  A.  No, I agreed for that certificate to be held as well").

[15]PCO, ¶ 5.  See also RT Day 1 (Parker) at 26:3-9 ("Q.  I want to turn your attention to January 2006.  If you would refer to Exhibit 5-B, please.  If you would, would you identify Exhibit 5-B for the record.  A. Yes, sir, this is a private placement memorandum that our corporation, Transnational Automotive Group, had filed with the SEC outlining and specifying the details of the private placement memorandum for the financing that we were seeking").

in contact with Parker. This contact resulted in Wilshinsky and a group of investors he controlled (the "Wilshinsky Group") investing roughly $1 million in March 2006, which investment grew to "[w]ell over $4 million" by the end of the summer of 2006. In exchange for this investment, the Wilshinsky Group acquired 4.5 million shares of TAG stock on March 9, 2006.[16]

10.   In March 2006, TAG's stock transfer agent, Holladay, was instructed to transfer 2.65 million shares of TAG common stock from Apache Group shareholders to Angus. Those shares, which were free trading, were represented by stock certificate numbers 2018, 2019 and 2020, dated March 20, 2006. Angus was identified on each certificate as the stockholder. The certificates were recorded in the TAG stock transfer journal maintained by Holladay. Angus did not take physical possession of the three certificates, which remained in Cerisse's custody for "safekeeping."[17]

11.   Cerisse held certificates 2018 through 2020 in escrow, awaiting the occurrence of two events: (1) payment of the cash balance due the Apache Group and (2) Angus' performance of his corporate development duties to Goldman's satisfaction.[18] There was no written escrow agreement.[19]

---

[16]PCO, ¶ 5; RT Day 2 (Wilshinsky) at 178:1-13, 180:8-11.

[17]PCO, ¶ 5. See also Exh. 4 (Holladay Transfer Log) at 542-545.

[18]PCO, ¶ 5. See also Cerisse Depo. at 36:9-37:16; RT Day 2 (Angus) at 159:16-160:1 ("Q. Christine Cerisse was holding your shares; is that correct? A. She was holding everyone's shares. Q. That was my next question. By everyone, she was holding all the stockholders in the company's shares; correct? A. Not all of them. I think Wilshinsky had his shares. Q. But she was holding Parker and Goldman's shares; correct? A. Yes. Q. Because Parker and Goldman hadn't yet paid for the company; correct? A. Yeah, I think that would probably be correct").

[19]RT Day 3 (Vandeberg) at 57:8-21 ("Q. During the course of this transaction, did you ever prepare an escrow agreement for the shares? A. No. Q. Do you know, did anybody else ever prepare an escrow agreement for the shares? A. Not to my knowledge. Q. Is it your testimony, then, that there is no written escrow agreement for the shares? A. Not to my knowledge. Q. So your answer would be? A. I don't know. Q. Is that something you would normally know about in the course of doing your job? A. Ah, yes").

12.  At the same time that the certificates 2018 through 2020 were prepared for Angus, Cerisse instructed Holladay to transfer stock certificates numbers 2007 through 2017 to members of the Wilshinsky Group. Certificates 2007 through 2017 were delivered to Wilshinsky for distribution to the members of the Wilshinsky Group. The Wilshinsky Group shares were not held in escrow.[20]

13.  Wilshinsky believed that his group's "initial investment was going to be used toward the purchase of [ ] buses" because "[t]hat's . . . what [he] discussed with Joe Parker and with Harry Stokes because they were on a short timetable to start – to acquire the vehicles from China."[21] Wilshinsky was not aware at the time of the initial investment that Cerisse was still owed $400,000 on the shell.[22] TAG did not spend any portion of the funds invested by the Wilshinsky Group during the spring and summer of 2006 to pay the $400,000 owed to the Apache Group.[23]

**C.    Wilshinsky Group's Second Investment and Conditions**

14.  In late June or early July 2006, Wilshinsky and Parker took a trip to China to show Wilshinsky "the contacts that [TAG] had in China, . . . the strength of [TAG's] business relationships and . . . [its] partners in China, and to let him know that the people [TAG was] working with in China were strong and had the capability of fulfilling the contracts. . . ."[24]

15.  In August 2006, there was a Board of Directors meeting concerning the financial condition of the company. At the time, the company had significant obligations, including a commitment to purchases buses from China, the cost of a plant and staff in Cameroon, and

---

[20]PCO, ¶ 5; Cerisse Depo. at 21:5-22:1.

[21]RT Day 2 (Wilshinsky) at 182:9-13.

[22]*Id.* at 186:10-19; see also RT Day 3 (Wilshinsky) at 13:2-17.

[23]PCO, ¶ 5.

[24]RT Day 1 (Parker) at 39:17-40:6.

6

1    the cost of an office lease and employees in the United States.  The company was running

2    out of money.[25]

3  16.    At approximately this same time, Wilshinsky first became aware of TAG's financial

4    situation, including the fact that members of the Apache Group was still owed

5    approximately $400,000 for their interest in the shell.[26] Cerisse was quite concerned that

6    the payment had not been made.[27]  Wilshinsky also found out from his co-investor Seid

7    Sadat that Parker had loaned himself $184,000 from TAG's general assets, that Goldman

8    had given himself a $40,000 bonus, and there were arrearages in salaries totaling almost

9    $600,000 that had been paid out but had not been disclosed to shareholders.[28]

10  17.    Shortly thereafter, Wilshinsky visited Seattle and confronted Parker.  "He said that he was

11    not satisfied with the management of the corporation, [Parker's] management of the

12    corporation, and the direction of the company.  He felt that it wasn't going fast enough.

13    He had deep personal reservations about [Parker's] ability to manage the company and

14    specifically told me that – in fact, he threatened. He said . . . we want [Parker] to leave

15    the company.  [Parker's] not doing this the way [Wilshinsky] wanted [him] to do it.  And

16    if [Parker won't] do this, [Wilshinsky] will sue the company, and [ ] sue [Parker], and [ ]

17    take it over.  In fact, . . . his pretty close to exact words were, 'We can do this the hard

---

[25]Cerisse Depo. at 23:24-24:18.  See also RT Day 1 (Parker) at 42:16-23 ("Q. As of the end of July, did you have the ability to pay recurring overhead expense, rent, payroll, taxes? A. We were just about out of money. Q.  Did you have other sources of equity capital available to you at that time? A.  None that I felt confident could deliver in time for us.").

[26]PTO, ¶ 5; Cerisse Depo. at 26:21-27:8.

[27]RT Day 1 (Parker) at 43:7-17 ("Q. By the way, at this time had her group been paid the remaining $400,000 it was owed?  A. No.  Q. Did she express any comments to you about that fact?  A. She was very concerned about that.  In fact, she was more concerned about that she would not get her $400,000.  She was in tears about that. Q. You say she would not get her $400,000.  Was that money going to her, or was it going to the so-called Apache investors?  A. It was supposed to go to the Apache investors").

[28]RT Day 2 (Wilshinsky) at 184:23-185:7.

way, or we can do this the easy way.'" When asked why Wilshinsky said he would sue the company, Parker testified that Wilshinsky "felt that the funds were being misused. . . ."[29] Wilshinsky acknowledged that he had threatened Parker. He said he told Parker that he was "going to sue him. [He] was going to go up the street to the State Attorney General and report what [Parker] had done. . . . What he did in taking out moneys, in setting up a side business to receive commissions on a company that he was the Chairman and president of was wrong."[30] Wilshinsky continued: "You could say it was embezzlement[.]"[31]

18.   Despite these concerns, in August 2006, the Wilshinsky Group agreed to invest more money in the company. It agreed to make an additional investment in TAG because "[i]f somebody didn't make an [additional] investment, all that had been invested [previously] would have been lost."[32] The Wilshinsky Group imposed the following conditions, among others, on its additional investment: (1) Parker and Goldman were to resign as officers and directors of TAG. (2) TAG's outstanding share capital was to be reduced to 35 million shares by having Parker and Goldman surrender approximately 18 million of the 24 million shares issued to them. (3) The approximately $400,000 owed to the Apache Group would be paid.[33]

19.   TAG held a Board of Directors' Meeting on August 22, 2006, at which the directors –

---

[29]RT Day 1 (Parker) at 40:24-41:25.

[30]RT Day 3 (Wilshinsky) at 9:21-10:14.

[31]*Id.* at 35:3.

[32]See RT Day 2 (Wilshinsky) at 197:15-198:5 ("Q. . . . So you found out that -- after you found out that the shell had not been completely paid for, they had an obligation on a lease and took out a new lease, they paid themselves bonuses and loans, were you -- were you requested by the company to make an even further investment? A. Requested? Q. Yes. A. If somebody didn't make an initial investment, all that had been invested would have been lost. Q. So you had no choice but to make a further investment; is that correct? A. Correct.").

[33]PCO, ¶ 5.

Parker, Goldman, Jenn, and Thompson – and three individuals – Cerisse, Wilshinsky, and Sadat – were present.[34] Parker said that Wilshinsky wanted to propose "changes in management, capitalization of the Company and reorganization." Sadat presented the eleven-point proposal, which included a $1.5 million investment by the Wilshinsky Group in return for the changes noted above, among others. The minutes of the meeting report that "Joe [Parker] stated that 1.5 million was a very generous offer and asked about the time frame on the funding. . . . Joe [Parker] said he personally endorse[d] Steve [Wilshinsky's] offer. . . . It is painful for the Company today, but it will be better in the long run." The minutes stated that Wilshinsky would "handle the restructuring of the shares," and would "go over that [subject] with [Cerisse] . . . and [Goldman] separately." Wilshinsky, Cerisse and Goldman would then "recommend what is [was to be] given back in stock and [what was to] be replaced by the issuance of warrants." The minutes stated that Wilshinsky did not believe the restructuring of the stock was "a Board matter," and that he felt it should be done "privately." The minutes noted that Wilshinsky "said the surrender of the 17.6 Million shares and the change of the Board was contingent upon [Cerisse] and the other shareholders [approving] the proposed share restructuring."[35] At the time he made this proposal, Wilshinksy believed that Cerisse "was in control of all the shares. . . [i]ncluding Mr. Angus's," as this is what Cerisse had represented to him.[36] The Board approved Wilshinsky's proposal unanimously.[37]

20.   A week or two after the August 22, 2006 Board meeting, Cerisse had a conversation with Angus about the stock restructure proposal. She explained "that all of the shareholders, including the founder shareholders and the shareholder consultants brought in by Dan

---

[34]Exh. 5 (Minutes of Directors' Meeting) at 000005.

[35]*Id.* at 000005-0000011.

[36]RT Day 3 (Wilshinsky) at 26:10-14.

[37]Exh. 5 (Minutes of Directors' Meeting) at 000005-0000011.

Goldman . . . and of course Dan Goldman and Mr. Parker, everybody would have shares that would be cancelled or reduced if they had not been issued yet, and that that amount . . . would be agreed between [Wilshinsky] and those individuals and that they would be getting some warrants for the portion of the shares cancelled." Cerisse and Angus met over coffee to discuss this; Wilshinsky happened to call Angus during the meeting. Angus "got up and walked away, [and] talked on his cell phone" to Wilshinsky.[38]

21.   Angus testified that during the call, Wilshinsky told him "that everyone needed to recapitalize and agree to do so out of the previous shareholders and people involved in the company so the company would look attractive enough for OPIC to become involved in larger financings. . . . [Wilshinsky] told [Angus] that he wanted [Angus] to take a million and a half shares and a million and a half warrants, and [Angus] told him to put it in writing and [Angus] would get back to him."[39]   Testifying to the same conversation, Wilshinsky stated that he "recall[ed] the conversation about [Angus] receiving 500,000 shares." Wilshinsky said he called Angus to "confirm[ ] with him what Christine Cerisse had spoken to [Wilshinsky] about, [i.e.,] that [Angus] would receive 500,000 shares." Wilshinsky testified that Angus confirmed that "his shares were going to go down to 500,000" and said that Angus did not ask him "to put that in writing[.]" Wilshinsky also noted that he and Angus discussed the fact that "the company was going to be issuing everybody that was taking a reduction warrants" with an "exercise price" of "a dollar and a half."[40] He said that Angus agreed to receive 2 million warrants.[41]

22.   After speaking with Wilshinsky, Angus returned to Cerisse. When he "came back to the table," Angus told Cerisse "that Mr. Wilshinsky had called him and asked him if he would

---

[38]Cerisse Depo. at 32:1-33:8.

[39]RT Day 2 (Angus) at 145:18-126:4.

[40]RT Day 2 (Wilshinsky) at 210:9-211:13.

[41]RT Day 3 (Wilshinsky) at 27:3-28:2.

agree to take less shares than what he had been promised by Mr. Goldman, and he would be getting less shares and he would be getting some warrants."[42]  Cerisse later learned from Wilshinsky that Angus had agreed to reduce his stockholding to 500,000 shares, and to receive 2,000,000 warrants.[43]

### D.      Holladay Executes the Stock Transfer

23.     On October 26, 2006, Holladay received a letter from an entity named Davlaur Equities, SA, accompanied by original TAG share certificate numbers 847, 844, 845, 2048, 2052, 2042, 2018, 2019, 2020, 848, 2032, 2033, 2034, 2035 and 811, all of which had been held by Cerisse.[44]  Sharon Owen and Tom Laucks, co-owners of defendant Holladay, testified that their company had a long-standing relationship with Cerisse.[45]  The letter Holladay received, however, was not signed by Cerisse, but by an individual named Lorenzo Oliva. Oliva was not an officer, director or employee of TAG.[46]  Owen and Laucks testified that Lorenzo Oliva was an individual of whom they had heard, but whose title and authority was unknown to them.[47]  Owen stated, however, that at the time of the transfer, she would have been "more familiar with" Oliva.  She also noted that the letter instructed her to send

---

[42]Cerisse Depo. at 32:1-33:8.

[43]*Id.* at 60:2-61:9.

[44]PCO, ¶ 5.  See also Exh. 7 (Oliva Letter).

[45]RT Day 1 (Owen) at 122:20-22 ("QUESTION: How do you know Ms. Cerisse? ANSWER: She calls us all the time.  She's involved in a lot of our clients, apparently").  See also RT Day 1 (Laucks) at 143:1-14 ("Q.  Do you know Christine Cerisse?  A.  I have never met her. As a matter of fact, I was quite interested to see her on the screen because I wanted to place a face with the voice.  Q.  I take it she's a regular customer of Holladay Stock Transfer?  A.  She used to be.  It seems like since she got married, she kind of got out of the business.  Q.  And how long ago was that?  A.  I can't tell you, but several years ago.  She was still involved during the time frame of this court, between '3, '4, '6, and '7.  Q.  Three, four, six, and seven?  A.  2003, '4, '5, '6, and '7").

[46]PCO, ¶ 5.

[47]*Id.*; see also RT Day 1 (Owen) at 128:5-129:4 (testifying that Oliva's name was familiar, but she could not recall if he had any responsibility with regard to TAG).

the certificates to James Vandeberg, whom she "kn[e]w as part of this company, [TAG's] attorney."[48]  Owen stated that she understood the instruction from Oliva to be effective because Holladay had "ha[d] some communication with [Vandeberg] that [Holladay] w[as] to work with this Lorenzo Oliva."[49]  Laucks testified that Oliva "had something to do with [TAG] – I don't know what he was.  But he acted as an escrow agent for Transnational Automotive in more than one situation."[50]

24.  Oliva's letter stated that certificates 2018, 2019 and 2020, held in Angus' name, as well as two other certificates, held in the names of Paul Marek and Cumblico Beach Inc., "ha[d] never been delivered or deposited, and that [Davlaur] ha[d] been instructed to return the shares to the original owners."[51]  Oliva instructed Holladay to cancel stock certificates, 2018 (650,000 shares), 2019 (1 million shares) and 2020 (1 million shares), issued in the name of Hamish Angus, and "reissue shares in the original owners' names."[52]  The original owners of the shares were: Eagle Transport (95,404 shares), Clinica Natural Limited (154,596 shares), Midian Investments, S.A. (250,000 shares), Davlaur Equities (1,400,000 shares), and Angus (150,000 shares).[53]  Once the shares were reissued in the original owners' names, the letter instructed Holladay to transfer the shares to the

---

[48]RT Day 1 (Owen) at 130:16-22.

[49]*Id.* at 134:25-135:2.  See also *id.* at 135:11-23 ("QUESTION:  Okay.  So at this point, is it a fair statement to say that you have no – no tangible physical record to show that you were authorized to act on Mr. Oliva's instruction?  ANSWER:  No, I wouldn't say that, because Lorenzo Oliva – I think we got a lot of things from him.  Then we were told by James Vandeberg, who we deal with quite a bit – Christine Cerisse as well – that it was okay to do –  you know, to listen to him.  So I'm not saying that, you know, we got a formal letter, but I'm sure we got some correspondence, and it's just not here.  We deal with these, you know, Christine and Vandeberg all the time").

[50]RT Day 1 (Laucks) at 168:10-169:1.

[51]Exh. 7 (Oliva Letter) at 000042.

[52]*Id.*

[53]PCO, ¶ 5.

12

following entities: Gatineau Pension Fund (1,100,000 shares) and Davlaur Equities (1,400,000 shares), Mazel Trust (2 million shares) and Moshe Wilshinsky (500,000 shares).[54]

25.   Holladay executed this instruction on or about November 3, 2006.   Holladay had issued share certificate numbers 2018, 2019 and 2020 to Angus on March 9, 2006.   Angus had not endorsed the certificates for transfer, and the certificates did not have any medallion signature guarantees[55] on them.   The certificates were delivered to Holladay without any documentation signed by Angus evidencing his consent to Davlaur's transfer instructions.   Holladay did not request further documentation before executing the Oliva instruction.[56]

26.   Laucks testified that he was "personally aware" that Angus' shares were "never delivered or deposited" because "there was constant communication between the company, meaning Vandeberg and Holladay, about these specific certificates. . . . [F]rom the original transfer, [Holladay] was informed that the company was planning some kind of merger, and [Holladay] was going to get a whole bunch of certificates. . . .   That's how [Laucks] knew that these specific ones . . . were supposedly going to an escrow agent."[57]

27.   Laucks stated that "the important part . . . [was] that they were all signed.   They were all signature guaranteed.   They were presented by Davlaur Equities, which meant that they were freely negotiable instruments, and Davlaur had the power of them because they had them. . . .   [Laucks] recall[ed] . . . [that] the Angus certificates were sent back by the

---

[54]*Id.*; Exh 7 (Oliva Letter) at 000043.

[55]A medallion guarantee is "like a notary.   You go over to the bank or – and you get – you show them your ID.   They believe it's you.   You sign it.   They Medallion stamp it."   (RT Day 1 (Owen) at 127:9-12).   A medallion guarantee is important in trading stock because the transfer agent, in this case Holladay, "do[es]n't know or . . . [doesn't] ever meet any of [the] transferees, . . . [the agent] need[s] to know that it's legitimately . . . validated by them, that they actually gave it, signed it, and not someone that stole it or found it."   (*Id.* at 127:13-19).

[56]PCO, ¶ 5.

[57]RT Day 1 (Laucks) at 169:18-170:15.

escrow agent because the . . . contractual obligation was wasn't met. So it was the escrow agent's responsibility to send them back to be . . . returned to the original owners, which means this transfer was rescinded, or . . . extinguished. It never happened. They [were to] go back to the rightful signature guaranteed certificates."[58]

28.   When asked why Holladay cancelled Angus' certifications without any endorsement, Laucks stated that the shares were not cancelled; rather, he stated, "[Holladay] rescinded the original transfer, which means it never happened. So this was gone. It was reversed. The ownership went back to the original certificates that had proper signature guarantees and signatures, and then the instructions were changed."[59]   Laucks said he believed the letter from Oliva was an effective and valid instruction because Holladay "created the original transfer.  [Holladay] w[as] informed that the transfer was going to Davlaur Equities and that it was going to be held in escrow.  And when [Holladay] received those certificates back, and [he and Owen] had communication from the company attorney, and [they] were told that this part of the transfer, the escrow agent had the responsibility to rescind these certificates because the contractual obligation had not been completed.  And so the certificates were reversed, rescinded, put in – [they were] given new instructions for them, and they were returned to the corporate attorney under Davlaur and Vandeberg's communication."[60]

29.   Angus' expert, Jeff Gottfredson, testified that the transfers of share certificate numbers 2018, 2019, and 2020 "were not done in conformity with industry practice and standard procedure in the transfer agency business in that they did not have an en[d]or[s]ement by

---

[58]*Id.* at 170:16-171:11. See also *id.* at 174:11-16 ("When the 10 million was sent to me, those were freely negotiable.  That's how Hamish got them.  But they went back to the escrow agent, who still had the right as the escrow agent to return them and rescind or reverse that transaction back to the original beneficial owners, which were freely negotiable.").

[59]RT Day 2 (Laucks) at 31:8-14.

[60]*Id.* at 31:21-32:8.

Mr. Angus. . . .  There was no signature guarantee on the certificates."[61]  Gottfredson stated that "allowing the transfer to go forward without [Angus'] signature did not meet the standards for stock transfer companies" because "[t]here[ was] no evidence that Mr. Angus released his interest in the certificates."[62]  On cross-examination, Gottfredson testified that in the case of an escrow, "the transfer agent [does not] require any endorsement on th[e] certificates[.]"[63]  He also conceded that "[i]f the counsel for Transnational had advised that Davlaur Equities was presenting certificates for transfer in an escrow situation and that Holladay should follow those instructions," Gottfredson would have been "satisf[ied]" that "Davlaur had authority to present the[ ] certificates."[64]

### E.   Board Does Not Approve Issuance of Warrants

30.   On November 7, 2006, Cerisse prepared a Board resolution regarding the issuance of warrants to several shareholders, including Angus.  Pursuant to the resolution, Angus would have received 2,000,000 warrants to purchase shares at $1.50.[65]  The Board did not approve the issuance of warrants, however, because Sadat withdrew his support for the resolution.[66]  Angus never received any warrants.[67]

### F.   Angus Files an Affidavit of Lost Certificate and Demands Compensation

31.   In early 2007, Angus contacted Holladay about his certificates.  Angus told Laucks that "he [had] lost" "certificates 2092 and 85. . . .  And that [Holladay] had the wrong address or whoever sent them to him had the wrong address, that they were never delivered.  So

---

[61]RT Day 2 (Gottfredson) at 64:10-18.

[62]*Id.* at 70:16-20.

[63]*Id.* at 86:16-21.

[64]*Id.* at 91:22-92:2.

[65]Cerisse Depo. at 33:16-34:9; Exh. 6 (Warrant Resolution).

[66]Cerisse Depo. at 40:11-41:16.

[67]*Id.* at 40:11-16.

[Laucks] e-mailed him two affidavits . . . to fill out, get [the] signature guaranteed, and return to [Holladay]."[68]  On February 9, 2007, Angus "sent [Holladay] the[ ] affidavits, and [Holladay] replaced [Angus'] two other certificates and returned them."  The affidavit stated that Angus had lost certificates 2092 (worth 150,000 shares) and 895 (worth 350,000 shares), for a total of 500,000 shares.[69]  Angus testified at the time that he "didn't complain to Holladay that [he] w[as] supposed to be getting more than 500,000 shares" because he "figured that because that was all that was there, . . . that was all [he] would ever get."[70]

32.  Angus received 500,000 shares of TAG common stock and sold the shares in open market trades.[71]  From February to July 2007, he sold 200,000 to 230,000 shares and received proceeds of $200,000 to $220,000.[72]  He sold the remainder of the 500,000 shares for 48 or 45 cents per share.[73]

33.  During the spring of 2007, Angus, through counsel, demanded compensation for the value of stock certificates 2018—2020, or in the alternative, for reissuance of 2.5 million shares of TAG stock.  TAG refused this demand.[74]

## II.    CONCLUSIONS OF LAW

### A.    Legal Standard Governing Conversion (Against TAG and Wilshinsky)

34.  "A conversion occurs where the defendant wrongfully exercises dominion over the

---

[68]RT Day 2 (Laucks) at 36:17-37:6.

[69]*Id.*; see also Exhs. 52, 53 (Affidavits of Lost Certificates).

[70]RT Day 2 (Angus) at 165:14-20.

[71]PCO, ¶ 5.

[72]RT Day 2 (Angus) at 147:12-20.

[73]*Id.* at 149:24-150:2.

[74]PCO, ¶ 5.

property of another."[75] *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 914 (9th Cir. 2008) (citing *Greka Integrated, Inc. v. Lowrey*, 133 Cal.App.4th 1572, 1581 (2005), in turn citing *Farmers Ins. Exch. v. Zerin*, 53 Cal.App.4th 445, 451 (1997)); see also 5 B. Witkin, SUMMARY OF CAL. LAW, Torts § 699 (10th ed. 2005). To prove conversion, a plaintiff must show: (1) that he owned or had a right to possess the property at the time of the conversion; (2) that defendant disposed of plaintiff's property or converted the property by a wrongful act; and (3) that he suffered damages as a result. *Fremont*, 523 F.3d at 914 (citing *Messerall v. Fulwider*, 199 Cal.App.3d 1324, 1329 (1988)); *Zerin*, 53 Cal.App.4th at 451-52 (setting forth the elements of a conversion claim)).

35.   A plaintiff asserting a conversion claim must also prove that he did not consent to defendant's exercise of dominion over the property. *Fremont*, 523 F.3d at 914 (citing *Farrington v. A. Teichert & Son, Inc.*, 59 Cal.App.2d 468, 474 (1943) (holding that no conversion claim will lie where the property owner consented to the removal of his personal property), and *Tavernier v. Maes*, 242 Cal.App.2d 532, 552 (1966) ("As to intentional invasions of the plaintiff's interests, his consent negatives the wrongful element of the defendant's act, and prevents the existence of a tort. 'The absence of lawful

---

[75]"California courts have [ ] long extended the tort [of conversion] to certain forms of intangible property such as stocks, bonds, [and] notes. . . ." *Kremen v. Cohen*, 325 F.3d 1035, 1041 (9th Cir. 2003) (citing, *inter alia*, *Ralston v. The Bank of California*, 112 Cal. 208, 213 (1896) (stock and dividends), and *Payne v. Elliot*, 54 Cal. 339, 341-42 (1880) (stock)); see also, e.g., *O'very v. Spectratek Technologies, Inc.*, No. CV 03-0540 CBM (PJWx), 2003 WL 25781232, *4 (C.D. Cal. Aug. 7, 2003) (citing *Kremen*'s statement that "'California courts have . . . long extended the tort [of conversion] to certain forms of intangible property such as stocks'").

In *Mears v. Crocker First Nat. Bank*, 84 Cal.App.2d 637 (1948), plaintiff filed a conversion claim against a transfer agent after the agent refused to split plaintiff's shares into a number of 20-share certificates as required by the stock exchange. The court held that the rule regarding conversion of corporate stock "applies as well to the shares represented by a certificate as to the actual certificate," and that "where a corporation refuses to allow a transfer of shares upon its books, the assignee may treat this as a conversion of his shares and sue the company for their value." *Id.* at 644; see also *Virtanen v. O'Connell*, 140 Cal.App.4th 688, 707 (2006) (holding that an escrow holder converted a seller's stock certificates by effecting a transfer of the shares before escrow conditions had been satisfied).

consent,' said Mr. Justice Holmes, 'is part of the definition of an assault.' The same is true of . . . conversion . . ." (citations omitted)).  "[T]he law is well settled that there can be no conversion where an owner either expressly or impliedly assents to or ratifies the taking, use or disposition of his property." *Fremont*, 523 F.3d at 914 (quoting *Farrington*, 59 Cal.App.2d at 474).

**B.     Whether Plaintiff Proved the Elements of a Conversion Claim by a Preponderance of the Evidence**

36.     Angus failed to prove by a preponderance of the evidence that he had a right to possess the share certificates and the stock they represented at the time of the alleged conversion.[76] When Angus entered into an agreement with Goldman and Parker to provide corporate development services to the company that was to become TAG, he was promised that he would receive shares then held by existing shareholders known as the Apache Group. Transfer of those shares to Angus was conditioned on a $400,000 payment to the Apache Group.  Cerisse held the shares for Angus in escrow until that condition was satisfied.[77]

---

[76]Angus asserts that the alleged conversion occurred on November 3, 2006, when 2.5 million shares were transferred out of his name, leaving him with only 500,000 shares.

[77]"There is no requirement that an escrow agreement be in writing." *Chase Inv. Services Corp. v. Law Offices of Jon Divens & Associates*, 748 F.Supp.2d 1145, 1177 n. 30 (C.D. Cal. 2010) (citing *Kelly v. Steinberg*, 148 Cal.App.2d 211, 216 (1957)).  "'Escrow' means any transaction wherein one person, for the purpose of effecting the sale, transfer, encumbering, or leasing of real or personal property to another person, delivers any written instrument, money, evidence of title to real or personal property, or other thing of value to a third person to be held by such third person until the happening of a specified event or the performance of a prescribed condition, when it is then to be delivered by such third person to a grantee, grantor, promisee, promisor, obligee, obligor, bailee, bailor, or any agent or employee of any of the latter." *In re Clement*, 136 B.R. 557, 561 (Bankr. C.D. Cal 1992) (citing CAL. FINANCE CODE § 17003).  See also *Jon Divens*, 748 F.Supp.2d at 1177 n. 30 ("Although Betts and Gambles did not have a written escrow agreement with Divens, the evidence produced at trial, including but not limited to the Declaration of Seth Betts and the March 6, 2009 letter from Roberson to Divens, is sufficient to prove that an escrow agreement existed and that Divens was to hold the Cobalt CMO pending the receipt of an advance payment by Up Right Holdings").

37.   In March 2006, when the Wilshinsky Group invested $2.1 million in TAG, the members of the Apache Group expected that they would be paid the $400,000 they were owed for the shell.[78]  This did not happen, however.[79]  Cerisse, therefore, continued to hold the shares that had been promised to Angus in escrow.

38.   By the time the Apache Group was finally paid the $400,000 it was owed – in October 2006 – conditions had been imposed by the Wilshinsky Group that affected the number of shares Angus was to receive.  Specifically, the Wilshinsky Group agreed to invest an additional $1.5 million in TAG conditioned on a global restructuring of TAG's stock that would reduce the total number of outstanding shares to 35 million.  All of the original shareholders were to accept a reduction in the number of shares they held, so as to permit an increase in the number of shares held by the Wilshinsky Group.  Shareholders whose shares were to be reduced were to receive warrants to purchase additional shares of TAG stock at a price of $1.50 per share.

39.   The court finds that during an August 2006 telephone conversation with Wilshinsky and an in-person meeting with Cerisse, Angus agreed to reduce his shares to 500,000, and to receive 1.5 million warrants to purchase shares at $1.50 per share.  He thus consented to defendants' exercise of dominion over his share certificates and the stock they represented.

40.   The court appreciates that Angus testified he did not agree to the share reduction.  The court, however, found the testimony of Wilshinsky and Cerisse more credible on this point.  Numerous witnesses testified that, given TAG's financial condition at the time, all shares of TAG stock, including Angus' shares, would have been worthless without the additional infusion of capital by the Wilshinsky Group.  It was this reality, in part, that led Parker and Goldman to agree to surrender 18 million of their 24 million shares, and that led Cerisse and other shareholders to agree to a global restructuring that would reduce their shares as well.   As TAG's corporate development consultant, Angus knew of the

---

[78]Cerisse Depo. at 51:3-11.

[79]*Id.* at 51:12-13.

company's difficult financial situation.   The court therefore finds Wilshinsky's and Cerisse's testimony that Angus consented to the reduction in shares more credible than Angus' testimony that he did not.[80]

41.   As a result, the court concludes that Angus failed to prove by a preponderance of the evidence that he was entitled to possession of the 2.5 million shares he contends were converted on November 3, 2006.  Because the court finds that Angus consented to the transfer of the shares, it finds in favor of defendants TAG and Wilshinsky on Angus' conversion claim.[81]

**C.   Legal Standard Governing Tortious Interference With Contract (Against Wilshinsky)**

42.   Under California law, the elements of a "cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts intended or designed to induce a breach or disruption of the contractual relationship; (4) actual breach

_____

[80]Angus' subsequent request that Holladay reissue share certificate numbers 2092 and 85 for 500,000 shares lends further support to the court's conclusion that Angus agreed to a reduction in his shares.  While Angus testified that he "figured that . . . that was all that was there, . . . [and] that was all [he] would ever get," his conduct was consistent with the agreement that Wilshinsky and Cerisse contend he made, and constitutes contemporaneous evidence of his understanding of the number of shares to which he was entitled.

[81]The court appreciates that Angus never received the 1.5 million warrants that were to have been issued to him under the stock restructuring agreement.  Angus has not argued that this failure constituted either conversion or a breach of contract, and the court notes that even if he had, he would have been unable to prove damage resulting from TAG's failure to issue the warrants.  The exercise price of the warrants was $1.50 per share.  (RT Day 2 (Wilshinsky) at 210:9-211:13.)  There is no evidence that at any time after October 2006, the stock price ever rose to $1.50 or above.  Rather, the evidence showed that at most, TAG shares were selling for approximately $1 per share.  This is the price at which the shares were selling at the end of October 2006.  (RT Day 2 (Wilshinsky) at 139:23-140:3.)  It is also the approximate price Angus received for the shares he sold between February and July 2007.  (RT Day 2 (Angus) at 147:12-20; 149:13-16.)   When he subsequently sold the balance of the 500,000 shares he ultimately received from Holladay, the sale price had dropped to $.45 or $.48 per share.  (RT Day 2 (Angus) at 149:17-150:2.)

1    or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas &*
2    *Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990); see *Quelimane Co. v.*
3    *Stewart Title Guaranty Co.* 19 Cal.4th 26, 55 (1998); see also *Fremont*, 523 F.3d at 909
4    (citing *Reeves v. Hanlon*, 33 Cal.4th 1140, 1148 (2004)).

5    43.   As respects the third element of the claim, "[n]o liability can arise unless [defendant's]
6         alleged wrongful or unjustified conduct caused the breach." *Fremont*, 523 F.3d at 909
7         (citing *Weiss v. Marcus*, 51 Cal.App.3d 590, 601 (1975), and *Augustine v. Trucco*, 124
8         Cal.App.2d 229, 245-46 (1954)).  In intentional tort cases, California uses the "substantial
9         factor" test to determine whether causation exists.  *Fremont*, 523 F.3d at 909 (citing
10        *Franklin v. Dynamic Details, Inc.*, 116 Cal.App.4th 375, 391 (2004) (applying the
11        substantial factor test in an intentional interference with contractual relations action, and
12        noting that "a cause of . . . damage . . . is something that is a substantial factor in bringing
13        about an injury, damage, loss or harm")).   "The substantial factor standard generally
14        produces the same results as does the 'but for' rule of causation which states that a
15        defendant's conduct is a cause of the injury if the injury would not have occurred 'but for'
16        that conduct." *Fremont*, 523 F.3d at 909 (quoting *Rutherford v. Owens-Illinois, Inc.*, 16
17        Cal.4th 953, 969 (1997)).

18   44.   California law defines "substantial" expansively, and courts have cautioned against placing
19        "undue emphasis" on the ordinary meaning of the word. *Rutherford*, 16 Cal.4th at 969
20        ("Undue emphasis should not be placed on the term 'substantial.'  For example, the
21        substantial factor standard, formulated to aid plaintiffs as a broader rule of causality than
22        the 'but for' test, has been invoked by defendants whose conduct is clearly a 'but for' cause
23        of plaintiff's injury but is nevertheless urged as an insubstantial contribution to the injury.
24        Misused in this way, the substantial factor test 'undermines the principles of comparative
25        negligence, under which a party is responsible for his or her share of negligence and the
26        harm caused thereby'" (citations omitted)); see also *U.S. Fid. & Guar. Co. v. Am.*
27        *Employer's Ins. Co.*, 159 Cal.App.3d 277, 285 (1984) ("The critical question as to
28        causation in intentional torts is whether the actor's conduct is a substantial factor in

bringing about the type of harm which he intended from his original act. [N]o consideration is given to the fact that after the event it appears highly extraordinary that it should have brought about such harm or that the actor's conduct has created a situation harmless unless acted upon by other forces for which the actor is not responsible"(internal citations and some punctuation omitted)).

45.   A plaintiff may establish intent to disrupt a contractual relationship by inference or by presenting direct evidence of defendant's intention. *Fremont*, 523 F.3d at 909. "Thus, the jury may 'infer culpable intent from conduct 'substantially certain' to interfere with the contract [or prospective relationship].'" *Savage v. Pac. Gas & Elec. Co.*, 21 Cal.App.4th 434, 449 (1993) (quoting *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 765-67 (1984)).

46.   Unlike intentional interference with prospective economic advantage, discussed *infra*, "wrongfulness" is not an element of intentional interference with contract. "Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage, it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself." *Quelimane Co.*, 19 Cal.4th at 55 (internal citation omitted); see also *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1158 (2003); *Woods v. Fox Broadcasting Sub., Inc.*, 129 Cal.App.4th 344, 349 (2005).

### D.   Whether Plaintiff Proved the Elements of a Tortious Interference with Contract Claim by a Preponderance of the Evidence

47.   Defendants do not dispute that Angus had a contractual relationship with TAG or that Wilshinsky knew about the contractual relationship.[82] The court, therefore, concludes that Angus proved these elements of the claim by a preponderance of the evidence.

48.   Because the court has concluded that Angus consented to a reduction in the number of shares he held to 500,000, however, it finds that he agreed to a modification of the terms

---

[82]See Defs' Trial Brief, ¶¶ 11-12.

of the contract, such that the later transfer of his shares did not constitute a breach of that contract.   "An essential element of a contract interference claim is proof that the defendant's conduct actually disrupted or breached the plaintiff's contract."   *Woods*, 129 Cal.App.4th at 356 (citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 514 n. 5 (1994)).   In an action to recover damages for inducing a breach of contract, plaintiff "'must establish, by the evidence, that the contract which otherwise would have been performed, was breached and abandoned by reason of'" defendant's conduct. *Allen v. Powell*, 248 Cal.App.2d 502, 507 (1967) (citing *Hill v. Progress Co.*, 79 Cal.App.2d 771, 780 (1947)).   Because at the time of the transfer of shares, Angus' contractual relationship with TAG entitled him only to 500,000 shares, he failed to prove any actual breach of that contract.

49.   Even had Angus not consented to the share transfer, the court would find that he failed to prove by a preponderance of the evidence that the contract "otherwise would have been performed[.]"   The evidence clearly showed that Angus' receipt of his shares was conditioned on the payment of the $400,000 cash balance due to members of the Apache Group.   By the beginning of October 2006, this condition had not yet been satisfied. Angus failed to prove that without the Wilshinsky Group's additional investment, the $400,000 cost of the shell could have been paid, and the escrow condition satisfied. Indeed, the evidence presented suggests otherwise.   All witnesses agreed that TAG's financial situation in the fall of 2006 was dire.   TAG was unable to meet any of its financial commitments, including the $400,000 payment to the Apache Group.   TAG was having trouble recruiting additional investment funds.   In fact, Wilshinsky testified that his group agreed to make an additional investment in TAG only because "[i]f somebody didn't make an [additional] investment, all that had been invested [previously] would have been lost."[83]   This testimony makes clear that the Wilshinsky Group agreed to make the

---

[83]See RT Day 2 (Wilshinsky) at 197:15-198:5 ("Q. . . . So you found out that – after you found out that the shell had not been completely paid for, they had an obligation on a lease and took out a new lease, they paid themselves bonuses and loans, were you – were you requested

additional investment in an attempt to salvage the $5 million already invested.  As the Wilshinsky Group had been TAG's primary investor prior to the fall of 2006, no other investor would have had the same interest in funding a company in TAG's shaky financial situation.  More importantly, none of the testimony indicated that there was any other possible source of funds to pay the Apache Group and satisfy the escrow condition, such that Angus would have been entitled to receive 3 million shares.

50.   For all of these reasons, therefore, Angus' claim for tortious interference with contract fails.

**E.   Legal Standard Governing Tortious Interference with Prospective Business Advantage (Against Wilshinsky)**

51.   The elements of the tort of intentional interference with prospective economic advantage are similar to the elements of an intentional interference with contract claim; the exception is that proof of a legally binding contract is not required.  *Pacific Gas & Electric Co.*, 50 Cal.3d at 1126.  "The chief practical distinction between interference with contract and interference with prospective economic advantage is that a broader range of privilege to interfere is recognized when the relationship or economic advantage interfered with is only prospective."  *Id*.  Thus, a plaintiff pleading such a claim must establish: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  *Korea Supply Co.*, 29 Cal.4th at 1153-54 (internal quotations omitted).

52.   Like the tort of intentional interference with contract, intentional interference with prospective economic advantage does not require a specific intent to interfere; it is

by the company to make an even further investment?  A. Requested?  Q. Yes.  A.  If somebody didn't make an initial investment, all that had been invested would have been lost.  Q. So you had no choice but to make a further investment; is that correct?  A.  Correct").

sufficient that defendant knew that interference was certain or substantially certain to result from his action.  *Id.* at 1156-57.  Unlike interference with contract, however, a plaintiff seeking to recover for intentional interference with  prospective economic relations must "prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself."  *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393 (1995).  An act is independently wrongful "if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *Korea Supply Co.*, 29 Cal.4th at 1159; *SC Manufactured Homes, Inc. v. Canyon View Estates, Inc.*, 148 Cal.App.4th 663, 673 n. 7 (2007) ("The plaintiff must also prove that the defendant engaged in an independently wrongful act in disrupting the relationship. . . .  In this regard, an act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard," quoting *Reeves*, 33 Cal.4th at 1152 n. 6 (citations and quotation marks omitted)).  See also *LiMandri v. Judkins*, 52 Cal.App.4th 326, 340-41 (1997) ("*Della Penna* did not specify what sort of conduct would qualify as 'wrongful' apart from the interference itself.  Justice Mosk's concurring opinion in *Della Penna* suggested the wrongfulness requirement would be satisfied by conduct that is independently tortious or a restraint of trade" (citations omitted)).

53.     "The tort of negligent interference with prospective economic advantage is established where a plaintiff demonstrates that (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or

advantage reasonably expected from the relationship." *North American Chemical Co. v. Superior Court*, 59 Cal.App.4th 764, 786 (1997).

54.   As a general matter, a party is liable for negligence only where he owes a duty of care to plaintiff or to a class of which plaintiff is a member. *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 803 (1979). A duty of care can arise through a statute or contract, or be premised on the general nature of the activity in which defendant engaged or the parties' relationship. *Id.* In the context of the tort of negligent interference with prospective economic advantage, the *J'Aire* Court required that there be proof that "a special relationship exists between the parties. . . ." *Id.* at 804.

55.   To determine whether there was a "special relationship" between the parties, the Court directed that six factors be balanced: "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm." *Id.* (citing *Biakanja v. Irving*, 49 Cal.2d 647, 650 (1958)).

56.   Courts have found special relationships in a variety of contexts. As the California Supreme Court observed in *Aas v. Superior Court*, 24 Cal.4th 627, 644-45 (2000)

> "To mention just a few, courts have relied on *J'Aire* to assess a chemical manufacturer's claim against a transportation company for business losses caused by the contamination of its product in shipment (*North American Chemical Co. v. Superior Court* [(1995) . . . 59 Cal.App.4th 764, 781 785 . . . ); a dairy's claim against the manufacturer of an allegedly defective milking machine for lost profits and property damage (*Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1448-1457 . . .); a construction lender/ mortgagee's claim against a builder for construction defects (*Sumitomo Bank v. Taurus Developers, Inc.*, [1986] . . . 185

Cal.App.3d 211, 223-226 . . .); an abalone packer's claim for lost profits against the manufacturer of unusable cans (*Ales-Peratis Foods Internat., Inc. v. American Can Co.* (1985) 164 Cal.App.3d 277, 284-290 . . .); and real estate investors' claims for the cost of repairing construction defects in an apartment building (*Huang v. Garner*, [1984] . . . 157 Cal.App.3d 404, 422-425. . .).

Courts have applied *J'Aire* in cases where privity exists as well as cases where it does not. *Aas*, 24 Cal.4th at 645.

**F.   Whether Plaintiff Has Proven the Elements of Tortious Interference with Prospective Business Advantage by a Preponderance of the Evidence**

57.   For the reasons stated above, the court concludes that Angus failed to prove by a preponderance of the evidence that Wilshinsky's conduct caused an actual disruption in the economic benefit or advantage that Angus reasonably expected from the relationship with TAG.  While there was an economic relationship between Angus and TAG about which Wilshinsky knew, it was not, as of October 2006, an economic relationship from which Angus was likely to receive any future economic benefit or advantage.  Stated differently, absent the Wilshinsky Group's further investment in TAG, it is not probable that Angus would have derived any future economic benefit or advantage from his relationship with TAG, as the company would have been unable to meet its financial obligations and would likely have become insolvent. This alone merits judgment in favor of Wilshinsky on both Angus' intentional and negligent interference claims.

58.   The court also finds, however, that even had Angus not consented to a reduction in his number of shares, and even had he proved that the escrow conditions could have been satisfied without the Wilshinsky Group's investment (which he did not), he failed to prove by a preponderance of the evidence that Wilshinsky's conduct was independently wrongful. Angus cited two acts that he asserts were independently wrongful: (1) Wilshinsky's conversion of Angus' 2.5 million shares; and (2) Wilshinsky's threats of litigation.  Angus contends that both of these alleged acts were independently wrongful because they were

1   "unlawful, that is, . . . proscribed by some constitutional, statutory, regulatory, common

2   law, or other determinable legal standard." *Korea Supply Co.*, 29 Cal.4th at 1159.

3   59.   Courts have found that the commission of a separate tort satisfies the requirement that there

4   be an independently wrongful act.   See, e.g., *Monex Deposit Co. v. Gilliam*, 680

5   F.Supp.2d 1148, 1163 (C.D. Cal. 2010) ("[Plaintiff] argues that the intentional acts were

6   independently wrongful because they constituted the tort of attempted extortion.  As the

7   Court has determined that [plaintiff] is entitled to summary judgment on its attempted

8   extortion claim against [the defendant], the independently wrongful requirement is satisfied

9   with respect to him"); see also *Korea Supply Co.*, 29 Cal.4th at 1159 ("It follows that the

10   tort may be satisfied by intentional interference with prospective economic advantage by

11   *independently tortious means*[,]" quoting *Della Penna*, 11 Cal.4th at 408 (Mosk, J.,

12   concurring) (emphasis original)).   Cf. *Weststeyn Dairy 2 v. Eades Commodities Co.*, 280

13   F.Supp.2d 1044, 1090 (E.D. Cal. 2003) (considering whether defendant's alleged

14   conversion of plaintiffs' funds held in trust constituted independently wrongful conduct,

15   and finding that, since the evidence did not support plaintiff's conversion claim, its claim

16   for interference with prospective economic advantage failed as well).

17   60.   Courts have also found that inappropriate threats of litigation will support a claim for

18   tortious interference with prospective economic advantage.[84]  Cf. *Reid-Ashman Mfg, Inc.*

19   *v. Swanson Semiconductor Service, L.L.C.*, No. C-06-4693 JCS, 2007 WL 1394427, *12

20   (N.D. Cal. May 10, 2007) ("The only question remaining [regarding plaintiff's tortious

21   interference with prospective business advantage claim] is whether the alleged conduct is

---

23   [84]See Comment on Clause (a) to the RESTATEMENT (SECOND) OF TORTS, § 767 ("In a very
24   early instance of liability for intentional interference, the means of inducement employed were
threats of 'mayhem and suits,' and both types of threats were deemed tortious.  Litigation and the
25   threat of litigation are powerful weapons.  When wrongfully instituted, litigation entails harmful
consequences to the public interest in judicial administration as well as to the actor's adversaries.
26   The use of these weapons of inducement is ordinarily wrongful if the actor has no belief in the
merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or
27   threatens to institute the litigation in bad faith, intending only to harass the third parties and not
28   to bring his claim to definitive adjudication").

28

'independently wrongful.' The Court concludes that by alleging that Reid-Ashman has engaged in sham litigation, it has met this requirement. . . .  [U]nfounded litigation has been held by California courts to be independently wrongful," citing *PMC, Inc. v. Saban Entm't, Inc.*, 45 Cal.App.4th 579, 602 (1996) ("Commonly included among improper means are actions which are independently actionable, violations of federal or state law or unethical business practices, e.g., violence, misrepresentation, unfounded litigation, defamation, trade libel or trade mark infringement"), disapproved of on other grounds in *Korea Supply Co.*, 29 Cal.4th at 1159 n.. 11).  See also, e.g., *Emack v. Kane*, 34 F. 46, 52 (C.C.N.D. Ill. 1888) (holding that the court had jurisdiction to restrain defendant from intimidating plaintiff by threatening to bring suit where the threat was not made in good faith, and noting that "[t]he average business man undoubtedly dreads, and avoids, if he can, a lawsuit of any kind. . .").

61.  As the court has found in favor of Wilshinsky on plaintiff's conversion claim, Wilshinsky's alleged conversion of the 2.5 million shares cannot support Angus' claim for intentional interference with prospective business advantage.

62.  Likewise, the court finds that Angus failed to prove by a preponderance of the evidence that Wilshinsky's conduct in threatening to sue Parker for mismanagement or bring criminal charges against him was independently wrongful.  To prevail on this claim, Angus would have had to show by a preponderance of the evidence that Wilshinsky's threat was unfounded or not made in good faith.  He failed to do so.  The only evidence Angus proffered suggesting that Wilshinsky's threat was unfounded was the equivocal testimony of Parker regarding his conduct.  When asked if there was "any substance to the accusation[s]" regarding his financial mismanagement or improprieties "in [his] mind[,]" Parker testified "No, sir."[85]  But later, when describing why he agreed to Wilshinsky's conditions, Parker stated that "[w]hat the situation was was that if we didn't leave, that there would be lawsuits, founded or unfounded, that would essentially cause the – any hope

---

[85]RT Day 1 (Parker) at 41:23-42:2.

of finance for the corporation to dry up for any number of months."[86]  Thus, even Parker's own testimony indicates that there was a possibility that "founded" lawsuits might have been brought regarding his mismanagement of the company.  This aspect of Parker's testimony is consistent with the testimony of Wilshinsky and Sadat, each of whom testified regarding the personal loans Parker had taken and the improper relationship between TAG and a consulting firm Parker owned.[87]  Furthermore, the minutes of the August 22, 2006 Board meeting, demonstrate general concern regarding "some legal liability involved with the past actions taken by Joe [Parker]."[88]

63.   In light of the evidence presented, the court concludes that Angus failed to prove by a preponderance of the evidence that Wilshinsky's threat of litigation was "unfounded" and thus failed to prove that such conduct was independently wrongful.  His intentional interference with prospective economic advantage fails for this reason, as well as for the reason that the evidence showed that there was no probability that Angus would derive any future economic benefit from his relationship with TAG as of October 2006.

64.   As respects Angus' claim for negligent interference with prospective economic advantage, the court has already noted that it fails because Angus did not prove that it was probable, as of October 2006, that he would have derived future economic benefit from his relationship with TAG.  Assuming, without deciding, that Wilshinsky owed Angus a duty of care,[89] the claim also fails because Angus failed to prove that Wilshinsky acted

---

[86]*Id.* at 49:21-50:5.

[87]RT Day 2 (Wilshinsky) at 184:23-185:7; RT Day 2 (Sadat) at 133:21-134:20.

[88]Exh. 5 (Minutes of Directors' Meeting) at 000009.

[89]On this record, it is not at all clear that Wilshinsky owed a duty of care.  Some *Biankanja* factors weigh in favor of a finding of special relationship between Wilshinksy and Angus.  Wilshinsky intended that the stock restructuring affect Angus by reducing the number of TAG shares he held, and the connection between Wilshinsky's conduct and the purported injury Angus suffered is thus close and direct.  Other factors, however, weigh against a finding that Wilshinsky owed Angus a duty of care.  First, given the financial condition of TAG in October 2006, Wilshinsky likely did not foresee that Angus would be injured by having his shares reduced.  This

negligently.  Wilshinsky approached Angus, explained that his group was prepared to make an additional investment in TAG in exchange for a restructuring of the company's stock that would give them a greater percentage interest in TAG.  He and the other investors were prepared to provide more funding to keep TAG in business.  Wilshinsky asked Angus to consent to the restructuring.   As the court has found, Angus gave his consent.  Wilshinsky thus acted with reasonable care in causing the restructuring to be carried out.

_____

is because, without the additional investment the Wilshinsky Group was prepared to make in exchange for greater percentage ownership of the company, Angus' TAG stock would likely have become worthless.  This same fact suggests that it is not certain Angus suffered injury as a result of Wilshinsky's actions.   Additionally, the court cannot find that any moral blame attached to Wilshinsky's conduct.  Wilshinsky did not effect the stock restructuring without asking Angus to consent to a reduction in his shares, and the court has found that Angus gave his consent.  Wilshinky thus had no cause to believe that he was acting contrary to Angus' wishes.  Wilshinsky also believed – with justification – that his actions were necessary to save the company and benefit all of the shareholders, including Angus.   Wilshinsky did not convert Angus' shares and the evidence showed that the litigation threat he made to Parker was justified.  Finally, policy reasons weigh against a finding of special relationship giving rise to a duty of care.   Although the California Supreme Court has recognized that "the exchange of promises resulting in . . . a formally cemented economic relationship is . . . worthy of protection from interference by a stranger to the agreement," *Della Penna*, 11 Cal.4th at 392, here Wilshinsky was not truly a stranger to the agreement.  He was a fellow shareholder in a company that was in dire financial straits and that had asked him to make a further investment so it could stay afloat.  The terms on which the Wilshinsky Group was prepared to make such an investment involved a restructuring of stock in the company, which made all of the shareholders, including Angus, parties to the arrangement.   Under such circumstances – where the investment was needed for both the company's and the shareholders' benefit – the court does not believe that policy reasons dictate finding that Wilshinsky owed Angus a duty of care.

**G.      Legal Standard Governing Wrongful Transfer of Stock Under Nevada Revised Statutes, N.R.S. §§104.8110(4), 104.8404 and 104.8407 (Against TAG and Holladay)**[90]

65.     N.R.S. §104.8404(1) provides that "an issuer is liable for wrongful registration of transfer if the issuer has registered a transfer of a security to a person not entitled to it, and the transfer was registered: (a) Pursuant to an ineffective endorsement or instruction; . . . or (d) By an issuer acting in collusion with the wrongdoer."

66.     The comment to Uniform Commercial Code § 8-404, upon which N.R.S. §104.8404 is based, notes that "Subsection (a)(1) provides that an issuer is liable if it registers transfer pursuant to an indorsement or instruction that was not effective.  For example, an issuer that registers transfer on a forged indorsement is liable to the registered owner.  The fact that the issuer had no reason to suspect that the indorsement was forged or that the issuer obtained the ordinary assurances . . . does not relieve the issuer from liability.  The reason that issuers obtain signature guaranties and other assurances is that they are liable for wrongful registration."

67.     N.R.S. §104.8407 provides that "[a] person acting as . . . transfer agent . . . for an issuer in the registration of a transfer of its securities, in the issue of new security certificates or uncertificated securities or in the cancellation of surrendered security certificates has the same obligation to the holder or owner of a certificated or uncertificated security with regard to the particular functions performed as the issuer has in regard to those functions."

68.     The comment to Uniform Commercial Code § 8-407, upon which N.R.S. §104.8407 is based, noted that "[t]ransfer agents, registrars, and the like are here expressly held liable both to the issuer and to the owner for wrongful refusal to register a transfer as well as for wrongful registration of a transfer in any case within the scope of their respective functions

---

[90]This claim arises under Article 8 of the Uniform Commercial Code. Under California Commercial Code § 8110 and N.R.S. § 104.8110, the substantive law of the state of formation of the issuer controls.  TAG is a Nevada corporation.  Therefore, the parties agree that the claim must be decided under Nevada law.  (See PCO at 15).

where the issuer would itself be liable.  Those cases which have regarded these parties solely as agents of the issuer and have therefore refused to recognize their liability to the owner for mere non-feasance, i.e., refusal to register a transfer, are rejected."

**H.      Whether Plaintiff Proved the Elements of Wrongful Transfer of Stock Under Nevada Revised Statutes, N.R.S. §§104.8110(4), 104.8404 and 104.8407 by a Preponderance of the Evidence**

69.     As the court has found that Angus consented to the reduction in his shares, he failed to prove by a preponderance of the evidence that TAG authorized the transfer of a security to "a person not entitled to it[.]"  As a result, defendants TAG and Holladay are entitled to judgment in their favor on plaintiff's claim for wrongful transfer of stock.

70.     Even had Angus not consented to the share transfer, the court concludes that defendants acted pursuant to an effective instruction from Cerisse, the escrow holder.  Angus' expert Gottfredson testified on cross examination that in the case of an escrow, "the transfer agent [does not] require any endorsement on th[e] certificates[.]"[91]  He further stated that "[i]f the counsel for Transnational had advised that Davlaur Equities was presenting certificates for transfer in an escrow situation and that Holladay should follow those instructions" Gottfredson would have been "satisf[ied]" that "Davlaur had authority to present the[ ] certificates."[92]

71.     Gottfredson's opinions corroborate the testimony of Owen and Laucks (1) that when Laucks received Oliva's instructions, he believed the letter to be a direction from an escrow holder; and (2) that because Holladay rescinded a prior transfer of undelivered shares upon the instruction of an escrow holder, due to failure of the escrow conditions, the transfer agent did not need Angus' endorsement.

72.     With regard to Oliva's authority to instruct Holladay to make the transfer, Owen and

---

[91]RT Day 2 (Gottfredson) at 86:16-21.

[92]*Id.* at 91:22-92:2.

Laucks both testified that their company had a long-standing relationship with Cerisse.[93] Vandeberg testified that he believed Cerisse controlled Davlaur Equities.[94]  Cerisse, of course, had been holding Angus' shares in escrow pending TAG's payment of $400,000 to the Apache Group.   Owen testified that Oliva's letter instructed her to send the certificates to Vandeberg, whom she "kn[e]w as part of this company, [TAG's] attorney."[95]  She also stated that Holladay "ha[d] some communication with [Vandeberg] that [Holladay] w[as] to work with this Lorenzo Oliva."[96]  Laucks testified that he knew Oliva "had something to do with [TAG] – [although he didn't] know wh[o] [Oliva] was[,] [he knew that Oliva had] acted as an escrow agent for Transnational Automotive in more than one situation."[97]  Laucks stated that he believed the letter from Oliva was an effective and valid instruction because Holladay had "created the original transfer. [Holladay] w[as] informed that the transfer was going to Davlaur Equities and that it was going to be held

---

[93]RT Day 1 (Owen) at 122:20-22 ("QUESTION: How do you know Ms. Cerisse? ANSWER: She calls us all the time.  She's involved in a lot of our clients, apparently").  See also RT Day 1 (Laucks) at 143:1-14 ("Q.  Do you know Christine Cerisse?  A.  I have never met her. As a matter of fact, I was quite interested to see her on the screen because I wanted to place a face with the voice.  Q.  I take it she's a regular customer of Holladay Stock Transfer?  A.  She used to be.  It seems like since she got married, she kind of got out of the business.  Q.  And how long ago was that?  A.  I can't tell you, but several years ago.  She was still involved during the time frame of this court, between '3, '4, '6, and '7.  Q.  Three, four, six, and seven?  A.  2003, '4, '5, '6, and '7.").

[94]RT Day 3 (Vandeberg) at 43:23-25.

[95]RT Day 1 (Owen) at 130:16-22.

[96]Id. at 134:25-135:2.  See also id. at 135:11-23 ("QUESTION: Okay.  So at this point, is it a fair statement to say that you have no – no tangible physical record to show that you were authorized to act on Mr. Oliva's instruction?  ANSWER:  No, I wouldn't say that, because Lorenzo Oliva – I think we got a lot of things from him.  Then we were told by James Vandeberg, who we deal with quite a bit – Christine Cerisse as well – that it was okay to do –  you know, to listen to him.  So I'm not saying that, you know, we got a formal letter, but I'm sure we got some correspondence, and it's just not here.  We deal with these, you know, Christine and Vandeberg all the time").

[97]RT Day 1 (Laucks) at 168:10-169:1.

in escrow.  And when [Holladay] received those certificates back, and [he and Owen] had communication from the company attorney, and [they] were told that [for] this part of the transfer, the escrow agent had the responsibility to rescind these certificates because the contractual obligation had not been completed.  And so the certificates were reversed, rescinded, put in – given new instructions for them, and they were returned to the corporate attorney under Davlaur and Vandeberg's communication."[98]

73.  Lauck testified that he was "personally aware" that Angus' shares were "never delivered or deposited" because "there was constant communication between the company, meaning Vandeberg and Holladay, about these specific certificates. . . .  That's how [Lauck] knew that these specific ones . . . were supposedly going to an escrow agent."[99]  He noted that "the important part [was] that [the certificates] were all signed.  They were all signature guaranteed.  They were presented by Davlaur Equities, which meant that they were freely negotiable instruments, and Davlaur had the power of them because they had them. . . . [Lauck] recall[ed] . . . [that] the Angus certificates were sent back by the escrow agent because the . . . contractual obligation was wasn't met.  So it was the escrow agent's responsibility to send them back to be . . . returned to the original owners, which means this transfer was rescinded[ ] or . . . extinguished.  It never happened.  [So the shares went] back to the rightful signature guaranteed certificates."[100]  When asked to clarify why Holladay would cancel Angus' certificates without an endorsement from Angus, Lauck stated that he "didn't cancel [them].  [Rather, Holladay] rescinded the original transfer, which mean[t] it never happened. . . .  It was reversed.  The ownership went back to the original certificates that had proper signature guarantees and signatures, and then the

[98]*Id.* at 31:21-32:8.

[99]RT Day 1 (Lauck) at 169:18-170:15.

[100]*Id.* at 170:16-171:11. See also *id.* at 174:11-16 ("When the 10 million was sent to me, those were freely negotiable.  That's how Hamish got them.  But they went back to the escrow agent, who still had the right as the escrow agent to return them and rescind or reverse that transaction back to the original beneficial owners, which were freely negotiable").

1    instructions were changed."[101]

2    74.   Based on this testimony, as well as the testimony of Angus' expert, the court concludes that

3          Holladay acted on instructions from the entity holding the shares in escrow, and properly

4          returned the shares to the original owners on the instructions of the escrow holder.  Angus

5          failed to demonstrate by a preponderance of the evidence that defendants acted below the

6          standard of care in failing to require an endorsement by him with signature guarantee

7          before returning the shares to Vandeberg in trust for Davlaur Equities and Gatineau

8          Pension Plan.

9    75.   Finally, the court concludes that Angus failed to prove by a preponderance of the evidence

10         that defendants TAG and Holladay violated N.R.S. §104.8404(1) by "acting in collusion

11         with the wrongdoer."   Angus contends that Cerisse, TAG's corporate secretary,

12         "collu[ded] with Wilshinsky to deliver the Angus shares to Wilshinsky's nominees as part

13         of Wilshinsky's scheme[ ] to take over TAG. . . ."  He asserts that she "acted on

14         Wilshinsky's instruction to transfer the Angus Shares to Wilshinsky's two proxies. . . ,"

15         and notes that her "motivation was simple[ – ] [m]oney[ – ] [as] [s]he stood to gain most

16         of the $400,000 that would flow into the company if Wilshinsky's group made further

17         investment."[102]  It thus appears that Angus contends Wilshinsky was the "wrongdoer" with

18         whom TAG, through Cerisse, "act[ed] in collusion" for purposes of N.R.S. §104.8404(1).

19   76.   Neither party cited any authority defining what a "wrongdoer" is for purposes of

20         §104.8404(1), and the court has found none.   According the term its ordinary meaning,

21         however, it would appear that the "wrongdoer" is one who attempts to secure a transfer

22         of shares to which he or it is not entitled.  This understanding is supported by the statute's

23         use of the word "collude," which means to act together or conspire to achieve a fraudulent,

24

25

26   _____

27   [101]RT Day 2 (Laucks) at 31:8-14.

28   [102]Pl.'s Trial Brief at 17-18.

illegal, or deceitful purpose.[103]   To conclude that Wilshinsky was a "wrongdoer," one would have to conclude that he and his group of investors had no right to any of Angus' shares.  The court has found, however, that Angus consented to a reduction in the number of shares he held to 500,000, and that the purpose of the share restructuring was to provide additional shares for the Wilshinsky Group in recognition of its infusion of an additional $1.5 million into TAG.  Both Cerisse and Wilshinsky testified that they understood Angus had agreed to the reduction, and the court found their testimony more credible than Angus' testimony to the contrary.  The court thus cannot find that Wilshinsky was a "wrongdoer," or that he and Cerisse "colluded" to deprive Angus of shares to which he was otherwise entitled.

77.   For the reasons stated, therefore, the court concludes that Angus' claim for wrongful transfer of securities fails.

## I.   Legal Standard Governing Negligence (Against Holladay)

78.   To prove negligence under California law, a plaintiff must establish: "(1) defendant's legal duty of care toward plaintiff, (2) defendant's breach of that duty, (3) damage or injury to plaintiff, and (4) a causal relationship between defendant's negligence and plaintiff's damages."   *Palm v. United States*, 835 F.Supp. 512, 520 (N.D. Cal. 1993); see also *Krawitz v. Rusch*, 209 Cal.App.3d 957, 963 (1989) ("For a negligence cause of action, the plaintiff must allege a duty, a breach of that duty, and injury to the plaintiff as a proximate result of that breach"); *Peter W. v. San Francisco Unified Sch. Dist.*, 60 Cal.App.3d 814, 820 (1976) ("According to the familiar California formula, the allegations requisite to a cause of action for negligence are (1) facts showing a duty of care in the defendant, (2) negligence constituting a breach of the duty, and (3) injury to the plaintiff as a proximate result").

---

[103]See http://www.thefreedictionary.com/collude (last visited December 18, 2011).

1
2

**J.      Whether Plaintiff Proved the Elements of a Negligence Claim by a Preponderance of the Evidence**

3    79.   For the same reasons that the court concludes Holladay did not wrongfully transfer Angus'

4          shares, it finds that Angus failed to prove by a preponderance of the evidence that Holladay

5          breached any duty it may have owed him as a shareholder.[104]   Angus asserts that the

6          transfer agent's conduct fell below the standard of care because Holladay transferred stock

7          pursuant to an ineffective instruction and without proper endorsement.   As even Angus'

8          expert testified, however, in the case of an escrow, "the transfer agent [does not] require

9          any endorsement on th[e] certificates[.]"[105] The expert also stated that "[i]f the counsel for

10         Transnational had advised that Davlaur Equities was presenting certificates for transfer in

11         an escrow situation and that Holladay should follow those instructions," Gottfredson would

12         have been "satisf[ied]" that "Davlaur had authority to present the[ ] certificates."[106]  As the

13         court has found these facts to be true – that Holladay acted pursuant to the instructions of

14         an escrow holder, and that Vandeberg informed Holladay that Oliva had the authority to

15

16         ───────────────

17         [104]There is some question whether, under California law, a transfer agent owes a

18    shareholder any duty or whether the agent's duty is owed solely to the issuer.   See *Mears v. Crocker First Nat. Bank of San Francisco*, 97 Cal.App.2d 482, 485 (1950) (stating, in a

18    conversion case, that "[a]ppellant urges in the first place that there is no direct liability of a

19    transfer agent or transfer officer to the holder for delay in transferring or refusal to transfer stock

20    even if such delay or refusal is wrongful, and might subject the corporation itself to liability in

20    damages or in conversion.   The agent or officer owes his duty only to the Company, his principal,

21    not to the individual stockholder.   That such is the law in the absence of any express statutory

22    provision to the contrary is borne out by numerous and unanimous authorities").   The *Mears* court

22    noted that "[t]he theoretical basis of the rule is that the delay or refusal is a nonfeasance, the

23    nonperformance of a duty owed to the principal only because of the existing agency relation, not

24    a misfeasance or malfeasance, the breach of a duty owed individually to third parties independent

24    of such agency relation."   *Id.*   Here, Angus' negligence claim against Holladay appears to be

25    based on malfeasance, i.e., the affirmative act of transferring stock to which Angus was allegedly

25    entitled into the name of another.   Consequently, the court assumes, without deciding, that

26    Holladay owed a duty to Angus to exercise due care under the circumstances of this case.

27         [105]RT Day 2 (Gottfredson) at 86:16-21.

28         [106]*Id.* at 91:22-92:2.

instruct the transfer – the court concludes that Angus failed to prove that Holladay's conduct fell below the standard of care for a stock transfer agent.

80.  Gottfredson suggested that he personally would have asked to see a written escrow agreement.  When asked whether the fact that Holladay failed to request a written escrow agreement meant that its conduct fell below the standard of care, however, he noted that "[t]here are no guidelines specifically stated for doing escrows for transfer agencies."[107] Gottfredson noted that "[t]he transfer agency transfers stock. They don't get involved in natural escrow except pursuant to the instructions of the escrow."[108]  This testimony indicates that, despite Holladay's failure to ask for a copy of a written escrow agreement, it did not breach a duty of care to Angus.

81.  In addition, Gottfredson's testimony on cross-examination undercut his earlier opinion that transferring the certificates to Vandeberg violated the standard of care because Gottfredson "could find no reference [in the records he reviewed] to Jim Vandeberg as corporate counsel for the issuer."[109]  Gottfredson was asked whether, "[i]f [he] had known that Mr. Vandeberg was in fact the corporate counsel for the issuer over a period of years, [he] would still" believe a transfer to Vandeberg to be a breach of the standard of care. Gottfredson answered somewhat non-responsively: "Familiarity is no excuse for [not] doing the job or . . . following through on the procedures.  If you stick with the procedures and whoever presents to you, make them go through the same set of procedures and same mechanics that you require everyone to, you'll generally be – it will always work out." Defense counsel asked Gottfredson to clarify whether he believed "it [was] a violation of the standard of care, if [Holladay] kn[e]w that Mr. Vandeberg's the attorney for the company, [not] to go and find out if he's the attorney for the company[.]"  Gottfredson responded: "No, it's not, no.  I mean, it's not, but it's something I would still do.  I'd call

---

[107]*Id.* at 104:11-13.

[108]*Id.* at 105:16-18.

[109]*Id.* at 95:4-8.

the issuer up, say is it okay to do this.  I have these instructions.  Is that consistent with what your understanding of what you want to have happen." Gottfredson stated that, in this regard, he "would go higher than the standard of care[.]"[110]

82.    As Angus has proffered no other testimony that Holladay breached the standard of care, and as Gottfredson himself testified that Holladay did not violate the standard of care under the facts as the court has found them to be, the court concludes that Angus failed to meet his burden of proof on the negligence claim.

### III.    CONCLUSION

For the reasons stated, the court will enter judgment in defendants' favor on all causes of action.

DATED: January 17, 2012

_Margaret M. Morrow_
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[110]_Id._ at 95:9-96:5.  Gottfredson offered other opinions regarding irregularities in the transfer of the shares from Davlaur Equities and Gatineau Pension Plan to Moshe Wilshinsky and the Mazel Trust.  He asserted that this second transfer violated the SEC's turnaround rules, because Holladay did not send the shares to Davlaur Equities and Gatineau Pension Plan before effecting the second transfer, because Mazel Trust's shares were not properly registered (with the date of the trust agreement and name of the trustee), and because Holladay did not consider whether the trust's shares could be registered as free trading under SEC Rule 144.  These issues are not relevant in assessing whether Holladay breached a duty of care to Angus.  If the transfer of the shares held in Angus' name to Davlaur Equities and Gatineau Pension Plan was proper, any irregularities in subsequent transfers did not injure Angus.  The court notes nonetheless that Gottfredson's assertion that the transfer from Davlaur and Gatineau to Moshe Wilshinsky and the Mazel Trust violated the turnaround rule is incorrect.  Gottfredson testified that if Holladay sent the shares to Vandeberg in trust for Davlaur Equities and the Gatineau Pension Plan, and Vandeberg returned them two days later for further transfer to Moshe Wilshinsky and the Mazel Trust, there was no violation of the turnaround rule.  (RT Day 2 (Gottfredson) at 110:20-25, 111:10-15.)  It is clear from Vandeberg's testimony that the stock certificates were sent to him, and that he in turn sent them to Holladay to be transferred pursuant to the instructions he had received from Davlaur Equities.  (RT Day 3 (Vandeberg) at 43:20-45:9; 46:16-47:9; Exhs. 7, 74.)